**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Richard BREWER, Johnny Ray McPhail, Billy Burns and Red M. Cain, Defendants–Appellants.**

**Nos. 79–1447 to 79–1450.**

United States Court of Appeals, Tenth Circuit.

Submitted July 8, 1980.

Decided Sept. 26, 1980.

Hubert H. Bryant, U. S. Atty., and Kenneth P. Snoke, Asst. U. S. Atty., Tulsa, Okl., for plaintiff–appellee.

Terry L. Meltzer, Tulsa, Okl., for defendant–appellant Richard Brewer.

David O. Harris and Howard Sell, Tulsa, Okl., for defendant–appellant Johnny Ray McPhail.

Gomer A. Evans, Jr. of Oliver & Evans, Inc., Tulsa, Okl., for defendant–appellant Billy Burns.

Larry A. Gullekson and Stanley D. Monroe, of Frasier & Frasier, Tulsa, Okl., for defendant–appellant Red M. Cain.

Before BARRETT, DOYLE and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

Appellants are among seven defendants charged with knowingly and intentionally conspiring to distribute, and to possess with intent to distribute, amphetamine, a Schedule II controlled substance, in violation of 21 U.S.C.A. §§ 841(a)(1) and 846. Of the seven defendants named in the indictment, two pleaded guilty and testified for the Government. The remaining five defendants were found guilty.

We will highlight only the basic facts at this juncture. Robert D. Henderson, who pleaded guilty and testified for the Government at trial, was a key figure in most of the transactions. In early June, 1978, Henderson attempted to purchase a quantity of dihydromorphinone from John McPhail, a known source of supply for that drug. As a result of this transaction, McPhail later contacted Henderson in an effort to locate a source of supply for amphetamine in large quantities. Through a friend, Cathy Clouse, Henderson met such a source, Robert Brewer, and agreed on a distribution arrangement. The following day, Henderson, using Brewer as his source, delivered one–half ounce of amphetamine to McPhail for $550.00.

As a result of the distribution arrangement, Henderson visited Brewer at his Tulsa, Oklahoma apartment on several occasions. On one such occasion, Henderson met Richard Brewer, Robert Brewer's father. Thereafter, Henderson carried on numerous conversations with Richard Brewer in which he (Richard) evidenced substantial knowledge of Robert's drug activities. He also agreed to help Henderson locate Robert when Henderson needed additional quantities of amphetamine. In later conversations, the Brewers identified Red Cain as their source of supply.

Approximately the third week in July, Henderson met Billy Burns, and Jerry Leppke, his girlfriend. Burns requested Henderson to act as his source for "crystal". Henderson sold one–quarter ounce of amphetamine to Burns at that meeting. The amphetamine had previously been obtained from Robert Brewer. Additional quantities were thereafter sold to Burns by Henderson. This arrangement resulted in cutting McPhail, Burns' previous supplier, out of the picture. Henderson did not thereafter deal with McPhail.

On July 19, 1978, Tulsa, Oklahoma, police executed a search warrant at the Burns–Leppke residence which resulted in the seizure of amphetamine and paraphernalia. Later that same day, Leppke was approached at a nightclub by Henderson who had earlier arranged for the sale and delivery of a one thousand dollar quantity of amphetamine to Burns. The transaction failed to take place, however, because Leppke didn't have the money.

At the beginning of August, Robert Brewer visited the Hendersons' apartment complex with Red Cain. During this meeting, Brewer told Henderson that a pound of amphetamine was available for sale. Burns had ordered and was to purchase this pound of amphetamine from Henderson.

Following the visit, it was decided by Henderson and his wife that, after the delivery of the drugs to Burns, they would abscond with the anticipated proceeds of the sale–approximately $14,000.00. In furtherance of the scheme, the Hendersons parked an automobile near the apartment house Burns lived in to facilitate their escape. Henderson then met Burns at a local nightclub where the details of the sale were planned.

Late that day, the Hendersons drove to the Place One apartment complex in Tulsa, where they met Red Cain and Skip Swart. In an apartment in this complex, the drop–off point and time were agreed upon. Both Robert Brewer, who physically possessed the amphetamine, and the purchaser, Burns, were notified. Brewer met Henderson at Thirty–first and Sheridan Streets in Tulsa, the agreed drop–off point. From there, Brewer and Henderson each drove to the Place One apartments. At the apartments, Cain produced a key to the trunk of a Lincoln Continental Mark IV, in which the amphetamine was concealed, and handed it to Robert Brewer, the driver of the

automobile.[1]  Brewer and Henderson, along with his wife, then returned to the Thirty–first and Sheridan Street location in separate cars.  Bob Henderson joined Brewer in the Lincoln Continental, and Mrs. Henderson drove off to a prearranged meeting place.  Henderson and Brewer then drove to the Woodstock Apartments, where Burns lived.

After their arrival, and following considerable discussion, Brewer reluctantly agreed to allow Bob Henderson to deliver the amphetamine to the Burns apartment.  When Burns failed to produce all the cash, however, Henderson became uneasy and left the apartment with the drugs, fearing that he was being "set up".  Avoiding contact with Brewer, Henderson managed to reach the car he had earlier left at the apartment complex and drove to a prearranged location where he met his wife.  The Hendersons thereafter absconded with the drugs.

A "man–hunt" for the Hendersons ensued, directed primarily by Cain, Burns, Robert, and Richard Brewer.  Friends of the Hendersons were harassed, at gun point, abducted and beaten, by Cain, Burns and others, in an effort to locate the Hendersons.  While attempting to sell the stolen amphetamine, Henderson unwittingly delivered it to one Bill Reeder, who sold it to a confidential informant working with Drug Enforcement Administration agents.

At the conclusion of a lengthy trial, Richard Brewer, Robert Brewer, Billy Burns, John McPhail and Red Cain were found guilty.  All defendants have appealed, with the exception of Robert Brewer.

The primary issues raised on appeal are whether: (1) the evidence presented at trial established a single conspiracy; (2) the Court properly applied the co–conspirator rule to the testimony of Robert Henderson; and, (3) the Court erred in admitting eight ounces of amphetamine identified as one-half of the one pound of amphetamine involved in the final sale transaction.  Various secondary challenges have also been raised.

1.  The automobile was owned by Richard Brewer.

*Single versus Multiple Conspiracies*

At trial, the Government sought to establish that all defendants conspired, in one scheme, to distribute, and possess with intent to distribute, amphetamine.  Each appellant now contends that the evidence adduced disclosed the existence of multiple conspiracies, rather than a single conspiracy.  On this basis, they argue that their convictions should be reversed under *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

■ "A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." *Dunn v. United States*, 442 U.S. 100, 105, 99 S.Ct. 2190, 2193, 60 L.Ed.2d 743 (1979). Such a variance, however, is not fatal to the government's case unless it affects the substantial rights of the accused. *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).  A prejudicial variance may occur where there is a "transference of guilt to an accused from incriminating evidence presented in connection with the prosecution of another in the same trial for a crime in which the accused did not participate." *United States v. Morris*, 623 F.2d 145, 149 (10th Cir. 1980).

Our analysis must begin with a determination of whether such a variance did, in fact, occur.  "Most narcotics networks involve loosely knit vertically–integrated combinations." *United States v. Panebianco*, 543 F.2d 447, 452–453 (2d Cir. 1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977).  The simple fact "that a number of separate transactions may have been involved  .  .  .  does not establish the existence of a number of separate conspiracies." *United States v. Parnell*, 581 F.2d 1374, 1382 (10th Cir. 1978), *cert. denied, sub nom., Cox v. United States*, 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979). Rather, it must normally be determined whether such activities constituted essential and integral steps toward the realization of a common, illicit goal.  *See, e. g., United*

*States v. Petersen*, 611 F.2d 1313 (10th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980). "Where large quantities of narcotics are being distributed, each major buyer may be presumed to know that he is part of a wide–ranging venture, the success of which depends on performance by others whose identity he may not even know." *United States v. Watson*, 594 F.2d 1330, 1340 (10th Cir. 1979), *cert. denied, sub nom., Brown v. United States*, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979). That "[s]ome of the participants remained with the enterprise from its inception until it was brought to an end, and others joined or left the scheme as it went along", is of no consequence if each knew he was part of a larger ongoing conspiracy. *United States v. Parnell, supra,* at 1382; *United States v. Watson, supra.*

■ Without detailing our review of the evidence, we hold that no fatal variance occurred. Appellants propose the existence of at least two, and possibly three separate conspiracies–the initial transactions in which McPhail was included; a second, involving the one pound quantity of amphetamine; and a third conspiracy which occurred when Henderson and Reeder dealt with the confidential informant.

Concerning the McPhail transactions, the fact that McPhail ceased his activities early in the scheme does not establish the existence of multiple conspiracies. It was McPhail who initiated the search for the Brewer–Cain source, and, once found, facilitated distribution to Burns. Henderson's by–pass, when McPhail failed to purchase additional amphetamine, did not indicate that a new conspiracy had begun. A conspiracy is not terminated simply by a turnover in personnel. *United States v. Panebianco, supra,* at p. 453.

McPhail was a member of the conspiracy from the outset, along with Henderson, Burns, Robert Brewer, and the sources of supply for Robert Brewer–Richard Brewer and Red Cain. He did nothing thereafter to withdraw or be legally separated from the conspiracy. There was no affirmative action either to make a clean breast to the authorities or communicate his disavowment of his future membership in the conspiracy to his co–conspirators. *United States v. Parnell, supra,* at p. 1384. "[M]ere cessation of activities alone is not enough. *Id.* at p. 1384.

The Government concedes that Henderson's agreement with Reeder, and others, to sell the stolen amphetamine constituted a separate conspiracy. This, of course, brings us to consideration of the second element—prejudice. The Henderson–Reeder evidence was admitted to complete the entire transaction involved in the unsuccessful conspiracy. Evidence of the co–conspirators' actions in attempting to locate Henderson and retrieve the drugs was part and parcel of the over–all scheme.[2] Any variance which occurred in relation to evidence concerning the Henderson–Reeder agreement to sell was certainly harmless. *United States v. Morris, supra.*

We hold that no fatal variance occurred.

### Co–Conspirator Testimony

Although not presented as a direct challenge, appellants argue that the admission of certain co–conspirator testimony constituted prejudicial error. This contention is unfounded.

■ It is clear that "statements made by one conspirator out of the presence of other coconspirators may be used not only against the declarant but also against his coconspirators where made during the course and in furtherance of the conspiracy." *United States v. Rios*, 611 F.2d 1335, 1340 (10th Cir. 1979). *See United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Morris, supra; United States v. Petersen, supra.* Following our careful review of the record, we hold that the challenged testimony was properly admitted under Fed.Rules Evid., rule 801(d)(2)(E), 28 U.S.C.A., and did not abridge appellants' constitutional right to confront witnesses.

---

**2.** No contention has been raised that evidence of co–conspirators' actions to locate Henderson was so inflammatory as to cause such extreme prejudice as to render it inadmissible.

One area of concern, although not raised as an issue on appeal, does require discussion. The trial judge gave proper cautionary instructions to the jury that hearsay statements could not be considered by them, until they determined that: a conspiracy existed; the co–conspirator and the defendant against whom the co–conspirator's statement was offered were members of the conspiracy; and, the statements were made during the course and in furtherance of the conspiracy. [R., Vol. I, p. 27; R., Vol. VI, pp. 612–613]. *See United States v. Rios, supra*, at pp. 1340–1341 n. 8, and cases cited therein.

■ In *United States v. Andrews*, 585 F.2d 961 (10th Cir. 1978), this Court revised the procedures which must be followed regarding the admission of a co–conspirator's hearsay statements. We have recently held, however, that our decision in *Andrews* applies only to co–conspirator statements which the Government seeks to introduce after the date of that opinion–October 13, 1978. *United States v. Rios, supra; United States v. Petersen, supra.* The trial of this case occurred after *Andrews* was announced. Unfortunately, the procedures announced in *Andrews*, and refined in *Petersen*, were not employed. However, no objections to these omissions were lodged at trial, or on appeal. Under such circumstances, reversal is not warranted "absent grave error which amounts to a fundamental miscarriage of justice." *United States v. Morris, supra*, at p. 150; *United States v. Hubbard*, 603 F.2d 137 (10th Cir. 1979).

"[O]ur decision in *Andrews* was not based on constitutional grounds; rather it was premised on the proposition that the recently adopted Federal Rules of Evidence altered the procedural requirements in this area." *United States v. Petersen, supra*, at p. 1329. While *Andrews* establishes a preferable manner of insulating defendants from the danger of prejudice presented by the admission of co–conspirator statements, the "prior procedures sufficiently protected defendants from . . . [such] dangers." *Id.* at 1329. Such procedures "permitted defendants to strenuously argue to the jury . . . that the statements should not be attributed to them." *Id.* at pp. 1328–1329.

These circumstances, combined with the strong showing of guilt as to each appellant, lead us to conclude that *plain error* did not occur. The prior procedures adequately protected each appellant. *Compare, United States v. Rios, supra* (No instruction was given to the jury prior to their deliberations, informing them of the limitations placed on the use of co–conspirator evidence, *and* the court did not make an *Andrews* decision in accordance with *Petersen* ).

## Physical Evidence

The Indictment in this case charged, among other things, that the defendants conspired to possess with intent to distribute, and to distribute, approximately one pound of amphetamine. The evidence showed that, after numerous negotiations, Robert Brewer delivered approximately sixteen one–ounce packages of amphetamine to Henderson, who in turn was to deliver them to Burns. Instead, Henderson absconded with the amphetamine and later sold eight ounces of it, through Reeder, to a confidential informant. The eight ounces of amphetamine, obtained by agents of the Drug Enforcement Administration on August 17, 1978, was introduced in evidence at trial as Exhibit Four. Appellants contend that the Court erred in allowing its admission on two grounds–one, it was not properly authenticated, and two, it related to collateral facts which were not relevant to the issues presented.

■ "Authentication and identification of evidence are merely aspects of relevancy which are a necessary condition precedent to admissibility." Weinstein & Berger, *Weinstein's Evidence*, para. 901(a)[02] (1978). Where physical evidence is involved, its authentication may be established, for admissibility purposes, "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.Rules Evid., rule 901(a), 28 U.S.C.A. *See also: United States v. Zink*,

612 F.2d 511 (10th Cir. 1980); *United States v. White*, 569 F.2d 263 (5th Cir. 1978), *cert. denied*, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978). This preliminary issue of admissibility is for the court to decide—it must ascertain whether there is a reasonable probability that the evidence has not been altered in any material aspect since the time of the crime and that it reasonably has a tendency to establish facts of consequence in the action as more probable than they would be without the evidence. *United States v. Luna*, 585 F.2d 1 (1st Cir. 1978), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1979); *United States v. Zink, supra*. Absent a clear abuse of discretion, the court's decision on this issue will not be disturbed. *United States v. Zink, supra; United States v. Coleman*, 524 F.2d 593 (10th Cir. 1975) (per curiam).

■ The identification of physical evidence, and its connection to a particular defendant, may be shown through either circumstantial or testimonial evidence. *United States v. White, supra*. In these cases, lack of possible identification, or proof of connection, affects the weight of the evidence rather than its ultimate admissibility once the preliminary issue of admissibility is determined. *United States v. Drumright*, 534 F.2d 1383 (10th Cir. 1975), *cert. denied*, 429 U.S. 960, 97 S.Ct. 385, 50 L.Ed.2d 327 (1976); *United States v. White, supra*.

■ Special Agent Hignight identified Exhibit Four as the eight ounces of amphetamine delivered to federal authorities on August 17, 1978; described the transaction prior thereto; and, accounted for the chain of custody of the exhibit since its seizure. Henderson accounted for the chain of custody before the date of the delivery—August 17, 1978. A Drug Enforcement Administration chemist testified as to his custody, and identified the substance as amphetamine. Although Reeder and the confidential informant did not testify at trial, our review of the record indicates that the Court did not abuse its discretion in deter-

mining the issue of preliminary admissibility. The appellants' contentions surrounding the lack of positive identification and proof of connection to them went to the weight of the evidence. The issue was strenuously argued to the jury prior to their deliberations, unquestionably considered by them, and rejected.

■ Turning to the relevancy issue, we hold that the Court did not err. The admission of Exhibit Four was relevant to show that: a conspiracy existed as described by Henderson and others; the substance delivered by Robert Brewer in early August was amphetamine; and, the conspiracy concerned large quantities of amphetamines as alleged in the Indictment, as opposed to lesser quantities such as those previously found in Burns' apartment. The collateral facts doctrine simply does not apply. *See* Louisell & Mueller, Federal Evidence, § 129 (1978).[3]

### Remaining Contentions

■ Appellants claim error in the denial of their motions for continuance of trial grounded on the "prejudicial effect" of trying the case on a piecemeal basis before a trial judge whose health was failing, and who subsequently died during trial. A motion for continuance is addressed to the sound discretion of the trial court, and its decision to grant or deny the continuance will not be disturbed on appeal absent a clear abuse of that discretion which results in manifest injustice. *United States v. Ready*, 574 F.2d 1009 (10th Cir. 1978); *United States v. Olivas*, 558 F.2d 1366 (10th Cir. 1977), *cert. denied*, 434 U.S. 866, 98 S.Ct. 203, 54 L.Ed.2d 142 (1977). Our examination of the course of trial following the denial of appellants' motions for continuance shows no prejudice resulting in manifest injustice to the appellants occurred. No abuse of discretion has been demonstrated.

■ The claim that the District Court erred in denying appellants' motions for

---

**3.** No contention is raised that Exhibit Four's admission in evidence violated Fed.Rules Evid., rule 403, 28 U.S.C.A. Nevertheless, such a contention would be unavailing.

new trial based on newly discovered evidence is also untenable. The motion was grounded on evidence which purportedly showed that Jerry Leppke was actively dealing in drugs in Tulsa, Oklahoma, on the day before trial. Its relevance related only to impeachment purposes. We agree with the District Court that, assuming all other prerequisites, "it is highly unlikely that defendants' newly discovered evidence would have produced a different result at trial." [R., Supp. Vol. p. 16]. *See United States v. Jackson*, 579 F.2d 553 (10th Cir. 1978), *cert. denied, sub nom. Allen v. United States*, 439 U.S. 981, 99 S.Ct. 569, 58 L.Ed.2d 652 (1978). The Court was not required to hold a hearing on the motion prior to its decision. *United States v. Allen*, 554 F.2d 398 (10th Cir. 1977), *cert. denied*, 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977); *United States v. Ward*, 544 F.2d 975 (8th Cir. 1976) (per curiam). It is apparent that, although no affidavits were produced by the appellants, the District Court assumed the existence of the evidence for purposes of its ruling.

▮▮▮▮ Burns argues that the sworn affidavit upon which a warrant to search his residence issued, was fatally defective. "It is elementary that in passing on the validity of a warrant, the reviewing court may consider *only* information brought to the magistrate's attention." *Aguilar v. Texas*, 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 1511 n. 1, 12 L.Ed.2d 723 (1964). The record before us does not contain the challenged affidavit. Accordingly, we have no occasion to determine the merits of Burns' challenge. *See Ham v. South Carolina*, 409 U.S. 524, 528, 93 S.Ct. 848, 851, 35 L.Ed.2d 46 (1973). "It is the responsibility of appellants to insure inclusion in the record of all trial materials upon which they intend to rely on appeal." *United States v. Johnson*, 584 F.2d 148, 156 n. 18 (6th Cir. 1978), *cert. denied* 440 U.S. 918, 99 S.Ct. 1240, 59 L.Ed.2d 469 (1979). *See e. g., United States v. Strand*, 617 F.2d 571 (10th Cir. 1980), *cert. docketed* (No. 79–2021, June 21, 1980).

▮▮▮▮ Prejudicial error is claimed to have occurred in connection with certain comments made by the Court, and in the closing arguments of the prosecution. Inasmuch as no objections were lodged to the remarks at trial, we must review them under the plain error standard of Fed.Rule Cr.Proc., rule 52, 18 U.S.C.A. Our conclusion is that any remarks made by the District Court did not give rise to such error. The prosecutor's argument, while unfortunate and beyond the bounds of proper conduct in some respects, did not give rise to plain error. *United States v. Bishop*, 534 F.2d 214 (10th Cir. 1976); *United States v. Harris*, 494 F.2d 1273 (10th Cir. 1974) (per curiam), *cert. denied*, 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265 (1974); *United States v. Martinez*, 487 F.2d 973 (10th Cir. 1973); *Devine v. United States*, 403 F.2d 93 (10th Cir. 1968), *cert. denied*, 394 U.S. 1003, 89 S.Ct. 1599, 22 L.Ed.2d 780 (1969). *Compare, United States v. Rios, supra.* Where a case is "vigorously and aggressively argued by both sides . . ., [t]he closing argument of a prosecutor need not be confined to such detached exposition as would be appropriate in a lecture." *United States v. Bishop, supra*, at p. 220, *quoting, United States v. Isaacs*, 493 F.2d 1124, 1164 (7th Cir. 1974), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). The prosecutor is afforded considerable latitude in the "right to reply to an argument raised by his opposing advocate." *Sanchez v. Heggie*, 531 F.2d 964, 967 (10th Cir. 1976), *cert. denied*, 429 U.S. 849, 97 S.Ct. 135, 50 L.Ed.2d 122 (1976), *quoting, United States v. Casteel*, 476 F.2d 152, 155 (10th Cir. 1972).

▮▮▮▮ Challenges are also posed as to the sufficiency of the evidence underlying the jury's verdict, and to the sentences imposed on each of the appellants. Without detailing our entire assessment of the record, we hold that, as to Burns and Cain, "viewing the evidence in a light most favorable to the prosecution, there was substantial evidence, together with reasonable inferences drawn therefrom, [to] sustain the verdict," *United States v. Tager*, 481 F.2d 97, 100 (10th Cir. 1973), *cert. denied*, 415 U.S. 914,

94 S.Ct. 1410, 39 L.Ed.2d 469 (1974).[4] Concerning the sentencing issues, this Court has held that unless we are convinced (which we are not in this case) that the sentences are "unconscionably excessive" the trial court's discretion in imposing sentences within statutory limits will not be disturbed. *United States v. Galoob*, 573 F.2d 1167 (10th Cir. 1978); *United States v. MacKay*, 491 F.2d 616 (10th Cir. 1973), *cert. denied*, 416 U.S. 972, 94 S.Ct. 1996, 40 L.Ed.2d 560 (1974). No error occurred in imposing the challenged sentences.

WE AFFIRM.

---

**4.** Richard Brewer and John McPhail do not challenge, on appeal, the sufficiency of the evidence underlying their convictions.