**FILED**
**United States Court of**
**Appeals**
**Tenth Circuit**

**April 4, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

LOS ROVELL DAHDA,

     Defendant - Appellant.

No. 15-3236

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:12-CR-20083-KHV-1)**
_____

Rick E. Bailey, Conlee, Schmidt & Emerson, L.L.P., Wichita, Kansas, for Defendant-Appellant.

Carrie N. Capwell, Assistant United States Attorney (Thomas E. Beall, Acting United States Attorney, with her on the briefs), Office of the United States Attorney, Kansas City, Kansas, for Plaintiff-Appellee.
_____

Before **LUCERO** and **BACHARACH**, Circuit Judges.[*]
_____

[*]    The Honorable Neil Gorsuch participated in the oral argument but not in the decision. The practice of this court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving the appeal. *See* 28 U.S.C. § 46(d); *see also United States v. Wiles*, 106 F.3d 1516, 1516, at n* (10th Cir. 1997) (noting that this court allows remaining panel judges to act as a quorum to resolve an appeal). In this case, the two remaining panel members are in agreement.

**BACHARACH**, Circuit Judge.

_____

Mr. Los Dahda was convicted of crimes growing out of an alleged marijuana distribution network centered in Kansas. The convictions resulted in a sentence of imprisonment and a fine of $16,985,250. On appeal, Los[1] presents six challenges to the convictions and sentence:

1. The evidence was insufficient to prove the conspiracy charged in count one.

2. An unconstitutional variance existed between (a) the single, large conspiracy charged in count one and (b) the trial evidence, which showed numerous smaller conspiracies.

3. The district court erred in denying a motion to suppress wiretap evidence because the wiretap authorization orders had allowed law enforcement to use stationary listening posts outside of the issuing court's territorial jurisdiction.

4. The district court failed to instruct the jury that maintenance of drug-involved premises is committed only if storing or distributing drugs constitutes a principal or primary purpose for the defendant's maintenance of the premises.

5. The district court violated the Constitution by sentencing Los to 189 months' imprisonment on count one without a jury finding on the marijuana quantity.

6. The district court erred in imposing a $16,985,250 fine.

We reject Los's first five challenges and agree with the sixth challenge. With these conclusions, we affirm the convictions, affirm the

---

[1] Mr. Los Dahda had numerous co-defendants, including his brother Mr. Roosevelt Dahda. To avoid confusion between the two brothers, we refer to Mr. Los Dahda by his first name.

2

sentence of 189 months' imprisonment on count one, and vacate the fine of $16,985,250.

**I.      The Drug Distribution Network**

The charges arose from a large drug-distribution operation that had been manned by over 40 individuals. These individuals obtained marijuana from California and distributed the marijuana in Kansas.

The operation began in 2006 when Mr. Chad Bauman, Mr. Peter Park, and Mr. Wayne Swift began working together to distribute marijuana in Kansas. At first, the individuals obtained their marijuana from Texas and Canada. Eventually, however, the three individuals changed sources and began obtaining their marijuana from California.

Mr. Bauman, Mr. Swift, or another member of the group would drive or fly to California, buy the marijuana, package it, store it in a California warehouse, and ship or drive the marijuana to Kansas.

Los allegedly joined the network as an importer and a dealer. In these roles, Los helped to facilitate the transactions by

- driving money from Kansas to California for someone in the group to buy the marijuana,

- assisting with the purchase and packaging of marijuana in California,

- loading marijuana into crates for shipment to Kansas, and

- selling the marijuana in Kansas to individuals who redistributed the marijuana to others.

3

The network operated for roughly seven years, but the relationships and work assignments varied over time. For instance, when a dispute arose, Mr. Bauman stopped working with Mr. Park and Mr. Swift. Nonetheless, Los continued to work with Mr. Bauman to acquire marijuana in California and transport the marijuana to Kansas for distribution there. About a year later, Los and Mr. Bauman stopped working together. At that point, Los resumed working with Mr. Park and Mr. Swift as the three individuals continued to acquire marijuana from California and distribute the marijuana in Kansas.

The government began investigating the drug network in 2011. As part of that investigation, the government obtained wiretap authorization orders covering telephones used by suspected members of the network. Ultimately, Los was convicted on 15 counts.

## II.    Sufficiency of the Evidence

Count 1 charged Los and 42 others with a conspiracy encompassing 1,000 kilograms or more of marijuana. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vii), 846, 856; 18 U.S.C. § 2.[2] Los argues that the trial evidence established only a series of smaller conspiracies rather than a single conspiracy involving 1,000 kilograms or more of marijuana. We disagree.

---

[2]    Count one also charged Los with a conspiracy involving cocaine. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)(II), 846, 856; 18 U.S.C. § 2. But the cocaine part of the conspiracy was not submitted to the jury.

4

To review sufficiency of the evidence, we engage in de novo review, considering the evidence in the light most favorable to the government to determine whether any rational jury could have found guilt beyond a reasonable doubt. *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006). In engaging in this review, we consider all of the evidence, direct and circumstantial, along with reasonable inferences. *Id*. But we do not weigh the evidence or consider the relative credibility of witnesses. *United States v. Wells*, 843 F.3d 1251, 1253 (10th Cir. 2016).

To prove a conspiracy, the government had to show that (1) two or more persons agreed to violate the law, (2) Los knew the essential objectives of the conspiracy, (3) Los knowingly and voluntarily participated in the conspiracy, and (4) the alleged co-conspirators were interdependent. *See United States v. Wardell*, 591 F.3d 1279, 1287 (10th Cir. 2009). Determining the presence of these elements is a factual issue for the jury. *See United States v. Dickey*, 736 F.2d 571, 581 (10th Cir. 1984) ("It is essential to emphasize initially that the question whether there existed evidence sufficient to establish a single conspiracy is one of fact for the jury to decide."). This issue turns here on the existence of a common, illicit goal. *See id*. at 582.

**A.   Sufficiency of the Evidence on a Single Conspiracy Involving 1,000 Kilograms or More of Marijuana**

The trial evidence was sufficient to show the existence of a single conspiracy involving 1,000 kilograms or more of marijuana. In part, this evidence included testimony by co-defendants Park, Swift, Bauman, Alarcon, Villareal, and Mussat. Their testimony was corroborated by recorded conversations, surveillance, seizures, and business records. Together, this evidence showed that Los and others had traveled to California to purchase marijuana, joined efforts to transport the marijuana to Kansas, and coordinated the delivery of marijuana after returning to Kansas. This evidence was sufficient to show formation of a conspiracy with a common goal between all of the participants to acquire and distribute marijuana. *See United States v. Dickey*, 736 F.2d 571, 582 (10th Cir. 1984); *cf. United States v. Edwards*, 69 F.3d 419, 431 (10th Cir. 1995) (holding that unity of purpose was proven by evidence that the defendants had pooled resources to "periodically travel to Houston to purchase cocaine, and divide the cocaine among the defendants upon return to Tulsa").

Los counters that the government failed to show a single conspiracy because

- the relationships between co-defendants sometimes changed over the course of time and

6

- the evidence did not show interdependence among co-conspirators.

Both arguments are unavailing.

On the first argument, Los points to a turnover in personnel as the conspiracy progressed. For example, Los, Mr. Park, Mr. Swift, and Mr. Bauman intermittently stopped and resumed doing business with one another, and the suppliers and customers occasionally changed. But changes in a conspiracy's membership do not necessarily convert a single conspiracy into multiple conspiracies. *United States v. Roberts*, 14 F.3d 502, 511 (10th Cir. 1993).

"That some of the participants remained with the enterprise from its inception until it was brought to an end, and others joined or left the scheme as it went along, is of no consequence if each knew he was part of a larger ongoing conspiracy." *United States v. Brewer*, 630 F.2d 795, 800 (10th Cir. 1980). The membership changes would not prevent a reasonable jury from finding Los's unity with others in a scheme to distribute large quantities of marijuana. *See United States v. Dickey*, 736 F.2d 571, 582 (10th Cir. 1984) (numerous marijuana and cocaine transactions over a five-year period with varying participants constituted a single conspiracy).

Second, Los argues that the evidence was insufficient to show interdependence among the co-conspirators. "[I]nterdependence may be shown if a defendant's actions facilitated the endeavors of other alleged

7

co-conspirators or facilitated the venture as a whole." *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1124 (10th Cir. 2011). In our view, the government's evidence was sufficient for a finding of interdependence.

The marijuana network required various individuals to perform different tasks, including growing marijuana in California, transporting funds to California, buying marijuana in California for distribution in Kansas, transporting the marijuana to Kansas, picking up the marijuana in Kansas, and distributing the marijuana in Kansas. *See United States v. Edwards*, 69 F.3d 419, 431-32 (10th Cir. 1995) (using similar reasoning to conclude that the government had established interdependence); *United States v. Watson*, 594 F.2d 1330, 1340 (10th Cir. 1979) ("Where large quantities of [drugs] are being distributed, each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know."). We thus conclude that the evidence established the element of interdependence.

## B. Sufficiency of the Evidence on Los's Participation in the Conspiracy

The trial evidence permitted the jury to find not only a single conspiracy involving 1,000 kilograms or more of marijuana but also Los's participation in that conspiracy. For instance, the trial testimony reflected eight facts:

8

1.	Los traveled to California to purchase marijuana from the group's suppliers. R. supp. vol. 1 at 3538, 3687, 4094-97, 4249-50, 4559-60, 5047-50.

2.	Large quantities of marijuana were purchased on these trips. *Id.* at 4102, 4348, 5083.

3.	Los purchased marijuana in California for transportation to Kansas. *Id.* at 4631, 4639, 4828-29.

4.	Los drove money from Kansas to California to purchase marijuana and drove newly acquired marijuana to the shipping warehouse in California. *Id.* at 3446-47, 4310, 4560-61, 5244-46.

5.	Los picked up marijuana that had been stored in the California warehouse. *Id.* at 3306-07, 4260-61.

6.	Mr. Park and Mr. Swift helped Los by shipping marijuana from California to Kansas. In return, Los provided marijuana on credit to Mr. Park and Mr. Swift. *Id.* at 4629-30, 4640.

7.	Los funded a grow operation in California that was run by a co-defendant, Mr. Justin Pickel. *Id.* at 5232-35. Co-defendants Park and Paiva helped with the grow operation. *Id.* at 5235, 5237, 5241. Approximately 200 marijuana plants were later found at Mr. Pickel's residence. *Id.* at 1960.

8.	In Kansas, Los and other co-conspirators sold marijuana to dealers in Kansas for redistribution there. *Id.* at 3285, 4263, 4348.

# Los's Contributions to the Global (1,000 Kg+) Conspiracy



10

Los counters with three arguments:

1. He did not agree to deal cocaine.

2. He did not agree to personally drive large quantities of marijuana.

3. He tried to keep his marijuana separate from the co-defendants' marijuana.

In part, Los contends that he did not share the essential objectives of the charged conspiracy because he did not know that some co-conspirators were also dealing in cocaine. This argument fails because a cocaine conspiracy was never submitted to the jury.

Though count one charged a conspiracy involving cocaine, this part of the conspiracy was not submitted to the jury. Thus, the jury had only to gauge the proof of a conspiracy involving marijuana. That proof was unaffected by the fact that some co-conspirators had also dealt in cocaine. *See United States v. Dickey*, 736 F.2d 571, 582-83 (10th Cir. 1984) (rejecting the argument that a conspiracy involving more than one drug constituted evidence of multiple conspiracies).

Los adds that he "did not want to be involved in large quantities of marijuana." Appellant's Opening Br. at 23. For this argument, Los relies on testimony that he did not want to drive hundreds of pounds of marijuana. R. supp. vol. 1 at 5170-71. But that testimony did not show that Los lacked knowledge of the scope of the marijuana network. To the contrary, the trial evidence showed that Los had known that large

11

quantities of marijuana were being grown and purchased in California and brought to Kansas. Los simply wanted someone else to drive the marijuana because of the risk that the driver would be caught; Los wanted others to bear that risk.

In analogous circumstances, we have recognized the sufficiency of evidence on a large drug conspiracy when various individuals perform assigned tasks involving the transportation and sale of illegal drugs. *See United States v. Evans*, 970 F.2d 663, 673 (10th Cir. 1992). In addition, we have upheld the sufficiency of evidence for particular defendants based on their roles and knowledge of "the nature and objectives of the criminal conspiracy." *United States v. Small*, 423 F.3d 1165, 1184 (10th Cir. 2005)*; see also United States v. Vaziri*, 164 F.3d 556, 565 (10th Cir. 1999) ("Generally, it is sufficient for purposes of a single-conspiracy finding that a conspirator knowingly participated with a core conspirator in achieving a common objective with knowledge of the larger venture."). Thus, a reasonable fact-finder could infer that Los shared the conspiratorial objectives.

Finally, Los denies that he and his alleged co-conspirators were interdependent. For this argument, Los points to evidence that he selected his own marijuana and kept track of his own marijuana and money even if they were being shipped with others' marijuana or money. But the jury also heard testimony that (1) Los's marijuana was sometimes combined with

12

marijuana purchased by others and (2) many individuals relied on Los as a supplier. R. supp. vol. 1, at 3653, 4638-39. In addition, the government presented evidence that Los had driven money to California for the group to buy marijuana, had bought the group's marijuana in Kansas, had stored the group's marijuana in a California warehouse, had picked up the group's marijuana from the Kansas warehouse, and had paid Mr. Pickel to grow marijuana for resale in Kansas. Together, the evidence allowed a jury to reasonably find the element of interdependence.

* * *

In sum, the government presented evidence that Los and others had frequently bought and sold marijuana from one another, worked together to grow marijuana, and united to transport marijuana from California for distribution in Kansas. Viewed in the light most favorable to the government, the evidence was sufficient to establish that Los had joined the single conspiracy charged in count one. We therefore reject Los's challenge to the sufficiency of the evidence regarding a single conspiracy of 1,000 kilograms or more.[3]

---

[3] In his reply brief, Los questions the jury instructions and verdict form for count one. But in his opening brief, Los confined his challenge to the sufficiency of the evidence; there was no challenge to the jury instructions or verdict form on count one. These omissions waived the challenges to the jury instructions and verdict form. *United States v. Martinez*, 518 F.3d 763, 767 n.2 (10th Cir. 2008).

13

## III. Variance

Los argues that there was a prejudicial variance between the conduct charged in count one and the trial evidence. According to Los, the evidence established smaller conspiracies rather than a single, large conspiracy.

"In the context of a conspiracy conviction, we treat a variance claim as a challenge to the sufficiency of the evidence establishing that each defendant was a member of the same conspiracy." *United States v. Gallegos*, 784 F.3d 1356, 1362 (10th Cir. 2015). Viewing the challenge in this manner, we engage in de novo review. *United States v. Caldwell*, 589 F.3d 1323, 1328 (10th Cir. 2009).

For the same reasons discussed above, we reject Los's allegation of a variance between the conspiracy charged in count one and the trial evidence. Accordingly, we affirm Los's conviction on the conspiracy charged in count one.

## IV. The Wiretap Authorization Orders

Much of the evidence against Los was obtained through wiretaps of cell phones used by Los and four co-conspirators. The wiretaps grew out of nine orders issued by the U.S. District Court for the District of Kansas.

Prior to trial, Los moved to suppress the intercepted communications, arguing that the wiretap orders exceeded the district court's territorial jurisdiction. We agree with Los that the wiretap orders exceeded the district court's territorial jurisdiction, but we affirm the denial of the

14

motion to suppress because the territorial defect did not directly and substantially affect a congressional intention to limit wiretapping.

## A. Standard of Review

We presume that the wiretap authorization orders were valid. *United States v. Radcliff*, 331 F.3d 1153, 1160 (10th Cir. 2001). Los incurred the burden to show otherwise. *Id*. In determining whether Los satisfied this burden, we engage in de novo review. *Id*.

## B. Facial Invalidity

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 permits courts to authorize law enforcement's interception of telephone communications. 18 U.S.C. §§ 2510-20. Under Title III, a suppression remedy exists for communications that were intercepted (1) unlawfully, (2) based on a facially insufficient wiretap authorization order, or (3) not in conformity with the wiretap authorization order. 18 U.S.C. § 2518(10)(a). Relying on the second ground for suppression, Los argues that the wiretap authorization orders were facially insufficient because they authorized use of a stationary listening post outside of the district court's territorial jurisdiction. We agree.

Title III permits a judge to authorize "interception" of telephone calls. 18 U.S.C. § 2518(3). Generally, this authority is limited to interceptions taking place within the judge's "territorial jurisdiction." *Id*. But an exception exists, allowing interception outside the judge's

15

territorial jurisdiction when a "mobile interception device" is used. *Id*. Thus, we must decide (1) whether the wiretap orders permitted interception outside the issuing court's territorial jurisdiction, and (2) if so, whether the orders limited extra-territorial interception to instances involving a mobile interception device.

On the first issue, the wiretap orders permitted interception outside of the issuing court's territorial jurisdiction. The wiretap authorization orders provided that "[p]ursuant to Title 18, United States Code § 2518(3), it is further Ordered that, in the event [the target telephone numbers] are transported outside the territorial jurisdiction of the court, interception may take place in any other jurisdiction within the United States." R. supp. vol. 4 at 166, supp. vol. 5 at 6, 173, 270, 386, 499-500, 638, 766, 915.

The term "intercept" is broadly defined in Title III. This definition includes the use of a "device" to acquire the "contents" of any telephone call. 18 U.S.C. § 2510(4). But "[t]he statute does not specify precisely where an interception is deemed to occur." *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992).

We addressed that issue in *United States v. Tavarez*, 40 F.3d 1136 (10th Cir. 1994). There we interpreted an Oklahoma counterpart to Title III, holding that interception occurs both where the tapped telephone is located and where the intercepted communications are first heard by law enforcement officials. *United States v. Tavarez*, 40 F.3d 1136, 1138 (10th

16

Cir. 1994). That holding was based on the definitions in Oklahoma law for "intercept" and "aural acquisition." *Id.*

Title III's definition of "intercept" is virtually identical to Oklahoma's definition, covering the aural acquisition of the content of any oral communication through a device. 18 U.S.C. § 2510(4). *Compare* Okla. Stat. tit. 13, § 176.2(9), *with* 18 U.S.C. § 2510(4). And the two laws contain similar definitions for "aural" communication. *Compare* Okla. Stat. tit. 13, § 176.2(2) (defining "aural acquisition"), *with* 18 U.S.C. § 2510(18) (defining "aural transfer"). Both definitions would unambiguously include hearing someone's telephone call. *See Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 739 (4th Cir. 1994) ("The recording of a telephone conversation alone constitutes an 'aural . . . acquisition' of that conversation."). Thus, an "interception" under Title III occurs both where the tapped telephones are located and where law enforcement officers put their listening post. Indeed, every circuit court to address the issue has adopted a similar definition. *See United States v. Jackson*, ___ F.3d ___, No. 14-3712, 2017 WL 727144, at *10 (3d Cir. Feb. 24, 2017).

In this case, the wiretap orders authorized interception of cell phones located outside the issuing court's territorial jurisdiction, using listening posts that were also stationed outside the court's territorial jurisdiction. The orders allowed interception outside the court's territorial jurisdiction because there was no geographic restriction on the locations of either the

17

cell phones or the listening posts. The orders therefore violated the general rule that interception must occur within the issuing court's territorial jurisdiction.

But the statutory exception allows law enforcement to listen to calls outside the issuing court's territorial jurisdiction by using a "mobile interception device." 18 U.S.C. § 2518(3). To determine whether this exception was triggered, we ask whether law enforcement used a "mobile interception device." This question turns on what a "mobile interception device" is.

Three possibilities exist:

1.    A listening device that is mobile,[4]

2.    a cell phone being intercepted, or

3.    a device that intercepts mobile communications, such as cell-phone calls.

Of the three possibilities, only the first one is compatible with the statute.

The statute's plain language controls unless the plain language would "produce a result demonstrably at odds with the intention of its

---

[4]    For example, some scholars point to small mobile devices such as "IMSI catchers," which are capable of intercepting the content from cell-phone calls. Gus Hosein & Caroline Wilson Palow, *Modern Safeguards for Modern Surveillance: An Analysis of Innovations in Communications*, 74 Ohio. St. L.J. 1071, 1081 (2013); Stephanie K. Pell & Christopher Soghoian, *Your Secret Stingray's No Secret Anymore: The Vanishing Government Monopoly Over Cell Phone Surveillance & Its Impact on National Security & Consumer Privacy*, 28 Harv. J.L. & Tech. 1, 11 (2014).

18

drafters . . . ." *Starzynski v. Sequoia Forest Indus.*, 72 F.3d 816, 820 (10th Cir. 1995). In examining the meaning of "mobile interception device," we begin with the words' grammatical functions. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 140 (2012) ("Words are to be given the meaning that proper grammar and usage would assign them.").

The term "mobile" is an adjective, which functions to modify a noun. *See Webster's Third New Int'l Dict.*, 1450 (Gove ed. 1993) (defining an adjective); Bryan A. Garner, *Garner's Dict. of Legal Usage* 23 (3d ed. 2011) (defining a noun). Accordingly, the term "mobile" modifies "interception device" and "the phrase 'mobile interception device' on its face appears to refer to the mobility of the device used to intercept communications." *United States v. North*, 735 F.3d 212, 218 (5th Cir. 2013) (DeMoss, J., concurring opinion).

The second possible interpretation would be to treat the cell phones themselves as "mobile interception devices." This interpretation is impossible to square with Title III. Title III describes the term "device" as something used to intercept a call. 18 U.S.C. § 2510(5). The cell phone is the thing being intercepted, not the thing being used to intercept the call. Thus, this interpretation is incompatible with Title III.

The third possibility treats a "mobile interception device" as something used to intercept mobile communications. This interpretation

19

would require us to rewrite the statute, creating an entirely different use of the term "mobile."

As discussed above, the statutory term "mobile" precedes two nouns: "interception" and "device." Thus, only three possibilities exist: The term "mobile" can modify (1) "interception," (2) "device," or (3) both "interception" and "device." But the third possible interpretation would ignore all of these possibilities, using "mobile" to modify the noun "telephone." This interpretation does not make sense because the word "telephone" is not included in the phrase "mobile interception device."

This interpretation is based on the Seventh Circuit's opinion in *United States v. Ramirez*, 112 F.3d 849 (7th Cir. 1997). In *Ramirez*, the Seventh Circuit concluded that the term "mobile interception device" includes devices that intercept mobile communications, such as cell phone calls. *Ramirez*, 112 F.3d at 853 ("The term [mobile interception device] in context means a device for intercepting mobile communications . . . ."). There, however, the Seventh Circuit acknowledged that its interpretation deviated from the statutory language. *Id.* at 852. The court recognized that the statutory language, when read literally, would prevent a judge from authorizing interception of cell phone calls through a stationary listening post when both the cell phones and the listening post are located outside of the judge's district. *Id.* at 852.

20

The Seventh Circuit declined to adopt the literal meaning of the statute, reasoning that the emphasis on the listening post's location "makes very little sense" because "that location is fortuitous from the standpoint of the criminal investigation." *Id.* at 852. The Seventh Circuit then examined Title III's legislative history and concluded that "'mobile interception device' was intended to carry a broader meaning than the literal one." *Id.* As the Seventh Circuit explained, Title III's legislative history states that the jurisdictional exception for mobile listening devices "applies to both a listening device installed in a vehicle and to a tap placed on a cellular or other telephone installed in a vehicle." *Id.* The Seventh Circuit concluded that (1) this discussion of "mobile interception device" was "illustrative rather than definitional" and (2) when placed in context, the term "mobile interception device" means "a device for intercepting mobile communications." *Id*. at 853.

Even if the legislative history was "illustrative rather than definitional," the illustration underscores the statute's plain language: A bug attached to a car phone is an interception device that is mobile. At a minimum, the legislative history is not demonstrably at odds with a literal interpretation of the statute. Thus, we are not at liberty to scuttle the statute's plain meaning.

Instead, we conclude that the term "mobile interception device" means a mobile device for intercepting communications. The wiretap

orders authorized interception of cell phones that were outside of the court's territorial jurisdiction, to be heard with stationary listening posts that could also be positioned outside of the court's jurisdiction. Thus, the orders were facially insufficient under Title III.

## C. Suppression as a Remedy

Though the wiretap orders were facially insufficient, the defect does not necessarily require suppression. *See United States v. Foy*, 641 F.3d 455, 463 (10th Cir. 2011) ("Not all deficiencies in wiretap applications . . . warrant suppression."). Rather, suppression is required only if the jurisdictional requirement is one of "those statutory requirements that directly and substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 527 (1974); *see United States v. Radcliff*, 331 F.3d 1153, 1162 (10th Cir. 2003) (extending this rule to suppression for facial insufficiency under 18 U.S.C. § 2518(10)(a)(ii)).

Applying this test, we conclude that suppression is not required for the district court's authorization of wiretaps beyond the court's territorial jurisdiction. *See Adams v. Lankford*, 788 F.3d 1493, 1500 (11th Cir. 1986) (holding that authorization of a wiretap order beyond the territorial restrictions in 18 U.S.C. § 2518(3) does not require suppression because the statutory violation would not implicate Congress's core concerns

22

underlying Title III). *But see United States v. Glover*, 736 F.3d 509, 515 (D.C. Cir. 2013) (concluding that territorial jurisdiction is a core concern of Title III).

We begin with the underlying concerns that animate Title III: "(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." S. Rep. No. 90-1097, at 66 (1968). Los does not explain how these congressional concerns relate to the statute's territorial limitation.

Congress's goals for Title III included

- protection of the privacy of oral and wire communications and

- establishment of a uniform basis for authorizing the interception of oral and wire communications.

*Id*.[5] In discussing how the statute protects privacy, the legislative history provides two examples:

1. Limiting who can conduct wiretaps (only "duly authorized law enforcement officers engaged in the investigation or prevention of specified types of serious crimes") and

2. creating an evidentiary burden for a wiretap (probable cause).

*Id*.

Not surprisingly, the territorial limitation does not appear in the congressional examples of privacy protections in Title III. And the

---

[5]     This list of Title III's goals is not exhaustive.

23

territorial limitation differs from these examples and was not mentioned in the legislative history. *See United States v. Chavez*, 416 U.S. 562, 578 (1974) (relying in part on the absence of legislative history concerning certain Title III provisions to conclude that a statutory violation did not warrant suppression).

Nor does the territorial requirement implicate the statutory goal of uniformity. Indeed, suppression might actually undermine this goal. In Title III, Congress sought to centralize electronic surveillance decisions with a state's chief prosecuting officer. S. Rep. No. 90-1097, at 98 (1968). But the territorial limitations potentially undermine uniformity by requiring prosecutors in multiple jurisdictions to coordinate about how they use electronic surveillance. *Adams v. Lankford*, 788 F.2d 1493, 1499 (11th Cir. 1986).

Los argues that the territorial limitation thwarts forum shopping, reducing opportunities for the government to manipulate the choice of a forum to obtain warrants that may not be approved elsewhere. *See United States v. North*, 735 F.3d 212, 218-19 (5th Cir. 2013) (DeMoss, J., concurring opinion) (relying on similar reasoning). In our view, however, the territorial limitation does not prevent forum shopping.

As noted above, a judge may authorize a wiretap if (1) the target phone is within the judge's territorial jurisdiction, (2) the government's stationary listening post is located in the judge's territorial jurisdiction, or

(3) the government is using an authorized mobile interception device. *See* Part IV(B), above. These statutory predicates permit forum shopping in two ways.

First, if the government wants to seek a wiretap authorization order from a particular court and neither the target phones nor a listening post are located in that court's territorial jurisdiction, the government could forum shop by using an authorized mobile interception device. *See* 18 U.S.C. § 2518(3). In that case, a judge can authorize interception anywhere in the United States simply by allowing agents to use a mobile device to intercept cell phone calls.

Second, the government can forum shop by using a listening post in the preferred judge's district. As noted above, an interception takes place where the listening post is. *See* Part IV(B), above. And law enforcement has free rein on where to put the listening post. Here, for example, if law enforcement had wanted to obtain a wiretap order from a judge in Nebraska, law enforcement could use a listening post in Nebraska even though none of the underlying events or suspected co-conspirators bore any connection to Nebraska. *See United States v. Jackson*, 207 F.3d 910, 914 (7th Cir.), *overruled on other grounds*, 531 U.S. 953 (2000).[6]

---

[6] Los contends that Title III's territorial restriction is designed to ensure a jurisdictional nexus between the issuing court and the telephones to be tapped.

25

For both reasons, the territorial limitations do not meaningfully curb the danger of forum shopping. [7]

\* \* \*

In sum, we hold that the facial defects in the nine wiretap authorization orders did not require suppression. Thus, the district court did not err in denying the motion to suppress. [8]

## V. Jury Finding on the Marijuana Quantity

Los was found guilty on count 1, which charged a conspiracy involving 1,000 kilograms or more of marijuana. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vii), 846, 856. For this count, Los obtained a sentence of 189 months' imprisonment. He contends that this sentence

---

Los cites no authority for this proposition, and it is hard to reconcile with the statute. The statute requires a jurisdictional nexus to either the stationary listening post or to the telephones to be tapped, but not to both. The use of telephones outside of Kansas did not trigger the statute's territorial restriction.

[7] Los does not dispute that for each call used at trial, the agents' listening post was located in the District of Kansas. These cell phone communications were intercepted in the issuing court's territorial jurisdiction, which fell within Title III's territorial limitations. But the orders would have allowed interception of calls outside the issuing court's jurisdiction.

[8] The government argues that even if the wiretap evidence should have been suppressed, any error in admitting the wiretap evidence would have been harmless because the government proved Los's guilt by overwhelming non-wiretap evidence. We need not reach this argument.

26

violates the Constitution because the jury did not specifically find the marijuana quantity involved in the conspiracy.

"We review the legality of an appellant's sentence de novo." *United States v. Jones*, 235 F.3d 1231, 1235 (10th Cir. 2000).

The penalties for violating § 841(a) appear in subsection (b). Subsection (b)(1)(D) provides a maximum sentence of 5 years' imprisonment if the total marijuana weight was less than 50 kilograms. 21 U.S.C. § 841 (b)(1)(D). Subsection (b)(1)(C) provides a maximum sentence of 20 years' imprisonment when no specific amount is charged. And subsections (b)(1)(A) and (B) provide higher maximum sentences depending on the type and quantity of the substance; in cases involving 1,000 kilograms or more of marijuana, subsection (b)(1)(A) imposes a mandatory minimum sentence of 10 years and a maximum sentence of life imprisonment. 21 U.S.C. § 841(b)(1)(A)(vii).

Although Los was found guilty of participating in a conspiracy involving 1,000 kilograms or more of marijuana, the government agreed to waive the 10-year mandatory minimum under § 841(b)(1)(A). Thus, Los was sentenced under § 841(b)(1)(C).

But he argues that he should have been subject to the 5-year maximum under § 841(b)(1)(D) because the verdict form did not require a specific determination of the marijuana quantity. We reject this argument

27

because the marijuana quantity, 1,000 kilograms, was an element of the charged conspiracy.

Los correctly argues that to increase his maximum sentence based on drug quantity, the quantity of drugs had to be charged in the indictment, submitted to the jury, and proven beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *United States v. Jones*, 235 F.3d 1231, 1233, 1236 (10th Cir. 2000). Thus, if the jury had not found a marijuana quantity beyond a reasonable doubt, the Constitution would have limited the maximum sentence to five years under § 841(b)(1)(D). *United States v. Cernobyl*, 255 F.3d 1215, 1220 (10th Cir. 2001).

But no constitutional violation took place. On count 1, the jury found that the conspiracy had involved 1,000 kilograms or more of marijuana. Though the quantity was not addressed on the verdict form, the quantity was charged in the indictment and included in Instruction 19: "As to each defendant, to carry its burden of proof on Count 1, the government must prove beyond a reasonable doubt each of the following elements: . . . the overall scope of the agreement involved more than 1,000 kilograms of marijuana." R. vol. 1 at 401. In turn, the verdict form directed the jury to make its findings on count 1 "[u]nder instructions 19-21." *Id.* at 433.

"We presume the jury follows its instructions" in the absence of an overwhelming probability to the contrary. *United States v. Rogers*, 556 F.3d 1130, 1141 (10th Cir. 2009); *United States v. Herron*, 432 F.3d 1127,

28

1135 (10th Cir. 2005). There is no reason to think that the jury disregarded its instructions, and we see no reason to reject the presumption here. Thus, we reject Los's challenge to the sentence on count one. *See United States v. Singh*, 532 F.3d 1053 (9th Cir. 2008) (holding that no *Apprendi* violation took place when the burden of proof on a fact, which enhanced the statutory maximum, was contained in a jury instruction but not in the verdict form); *United States v. O'Neel*, 362 F.3d 1310, 1314 (11th Cir. 2004) (same), *vacated sub nom.*, *Sapp v. United States*, 543 U.S. 1107 (2005), *reinstated*, 154 F. App'x 161 (11th Cir. 2005).

## VI. Jury Instruction on Maintenance of Premises to Store or Distribute Marijuana

Los was convicted of maintaining premises for the purpose of storing and distributing marijuana. *See* 21 U.S.C. § 856(a)(1)-(2) and 18 U.S.C. § 2. For guilt on maintaining drug-involved premises, the defendant must have "(1) knowingly (2) opened or maintained a place (3) for the purpose of manufacturing by repackaging, distributing, or using any controlled substance." *United States v. Williams*, 923 F.2d 1397, 1403 (10th Cir. 1990).

According to Los, the jury was improperly instructed on the third element. Los contends that the jury should have been told to consider whether storing or distributing marijuana was the *primary or principal*

29

purpose for maintaining the premise. The government contends that Los failed to preserve this argument, and we agree.

"[W]aiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1992) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Applying this definition, we conclude that Los intentionally relinquished his challenge to the content of the jury instruction. *See United States v. Teague*, 443 F.3d 1310, 1314 (10th Cir. 2006) ("[A] party that has *forfeited* a right by failing to make a proper objection may obtain relief for plain error; but a party that has *waived* a right is not entitled to appellate relief."). This relinquishment constituted a waiver.[9]

At the charging conference, Los represented that he was not challenging the content of the jury instruction. Instead, Los argued that there was not enough evidence to justify this instruction.

As Los points out, the district court initially construed this objection as a challenge to the instruction's content. R. sup. vol. 1 at 5780. But Los immediately clarified: "*I don't want the instruction changed*, I want it omitted because we're making an allegation that there was insufficient evidence to submit it." *Id.* (emphasis added). Based on this exchange, we conclude that Los waived any challenge to the content of the jury

---

[9]    The government urged forfeiture rather than waiver. But we may consider the issue of waiver sua sponte. *United States v. Mancera-Perez*, 505 F.3d 1054, 1057 n.3 (10th Cir. 2007).

30

instruction. *See United States v. Carrasco-Salazar*, 494 F.3d 1270, 1272-73 (10th Cir. 2007) ("[A]n abandoned objection is waived.").

We accordingly decline to consider Los's challenge to the content of the jury instruction.

## VII.  Fine

Finally, Los challenges the $16,985,250 fine as procedurally and substantively unreasonable. The government does not address these challenges, but concedes that the fine was erroneous because it exceeded the statutory maximum. We agree with this concession. Los was subject to a fine on 15 counts; for these counts, the maximum fine would have been

$13,750,000.[10] As a result, we reverse the district court's imposition of the fine and remand for reconsideration of the amount.[11]

---

[10] The government explained:

> As to Count One, 21 U.S.C. § 841(b)(1)(A) carries a maximum fine of $10,000,000.00 if the defendant is an individual. The maximum fine is $20,000,000 if the individual has a prior felony drug conviction, which is not applicable here. 21 U.S.C. § 841(b)(1)(A). As to Counts 26, 36, 43, 49, 73, 85, and 88, the maximum fine on each count is $250,000. 21 U.S.C. § 841(b)(1)(D). Count 31 carries a maximum fine of $500,000. 21 U.S.C. § 856(b). As to Counts 38, 39, 41, 42, 45, and 46, the maximum fine on each count is $250,000. 21 U.S.C. § 843(b); 18 U.S.C. § 3571. (*See also* Vol. 2, Doc. 2049, PSR ¶ 473.) Aggregating all of the maximum fines on each count of conviction results in a total potential maximum fine of $13,750,000.00.

Appellee's Response Br. at 57 n.24.

[11] We express no opinion on Los's arguments of procedural and substantive reasonableness.

**VIII. Disposition**

We affirm Los's convictions and sentence of 189 months' imprisonment on count 1. We reverse the imposition of a fine in the amount of $16,985,250 and remand for reconsideration of the amount.

15-3236, <u>United States v. Los Dahda</u>
**LUCERO**, J., concurring.

I join the majority opinion in full. I write separately to note that 18 U.S.C.

§ 2518(3) is in need of congressional attention. Both the terminology and the

mechanisms for intercepting calls have bypassed the quaint language of this statute.

Section 2518(3) empowers judges to authorize the interception of "electronic

communications within the territorial jurisdiction of the court in which the judge is

sitting." <u>Id.</u> Judges may also authorize interception "outside that jurisdiction but within

the United States in the case of a mobile interception device." <u>Id.</u> The congressional

discussion of this provision, which like the statute appears trapped in history, suggests

that the phrase "mobile interception device" would apply "to both a listening device

installed in a vehicle and to a tap placed on a cellular or other telephone instrument

installed in a vehicle." S. Rep. No. 99-541, at 30 (1986), <u>as reprinted in</u> 1986

U.S.C.C.A.N. 3555, 3584.

It seems that Congress intended to cover situations in which a phone being

monitored under a wiretap order leaves the original jurisdiction. But in crafting language

to deal with this contingency, Congress presumed that authorities would have to install a

physical device to monitor calls. <u>See id.</u> (discussing two hypotheticals, one in which a

judge "authorize[s] the installation of a device and the device will be installed within the

court's jurisdiction, but the suspect will subsequently move outside that jurisdiction," and

one in which "a device [is] authorized for installation in an automobile" but the vehicle is

"moved to another district prior to installation"). Advances in wiretapping technology

have rendered that presumption inaccurate. Mobile phone calls may now be monitored without a device located in close physical proximity to the phone.

Nevertheless, I agree with the majority opinion that we should not torture this statutory text to apply to all calls placed from a mobile phone. It is for Congress to update § 2518(3) to account for modern devices if it so chooses.